# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee



JUL 1 0 2025

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

DATA FROM A CELLULAR PHONE ASSOCIATED WITH THE UNITED CARTELS

)
)
)
)
)

Case No. 3:25-MJ-2204

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, fully incorporated herein.

located in the _____ Eastern _____ District of _____ Tennessee _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Sections 841, 846, 959, 963; | Conspiracy to possess with the intent to distribute controlled substances; Conspiracy to import controlled substances. |

The application is based on these facts:

See the attachment affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Robert Melone, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/10/25

_____
*Judge's signature*

City and state: Knoxville, TN

Jill E. McCook, U.S. Magistrate Court Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Robert Melone, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an electronic device and the data previously extracted from an electronic device, which are currently in law enforcement possession, and the search of the electronically stored information described in Attachment B.

2.     This affidavit is also made in support of an application for a warrant to search one Samsung Galaxy J2, Model: SM-J260T1; Phone #: 706-837-8451; IMEI: 356212108070237; hereinafter the "TARGET DEVICE," and the data previously extracted from the TARGET DEVICE pursuant to a federal search warrant.  The TARGET DEVICE and the data extracted from the TARGET DEVICE are currently located at a secure law enforcement facility in the Eastern District of Tennessee.

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), and 21 U.S.C. §§ 959, 963 (conspiracy to import controlled substances into the United States), hereinafter the "Subject Offenses", as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel,

experts, confidential sources, cooperating defendants, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

5. I have been a Special Agent ("SA") with Homeland Security Investigations ("HSI") since 2007. As such, I am a graduate from the Criminal Investigator Training Program and the HSI Special Agent Training held at the Federal Law Enforcement Training Center in Glynco, GA. Prior to working as an agent with HSI, I was employed as a police officer with the Chicago Police Department ("CPD") for approximately 13 years. At the beginning of my employment with the CPD, I graduated from the Chicago Police Academy. I have received extensive training pertaining to narcotic investigations and the investigations of various crimes that arise from drug trafficking activities. I have become familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statutes through my training and prior experience, including previous cases I have investigated with other municipal, state, and federal agents. I have investigated many cases in the Northern District of Illinois and elsewhere involving violations of state and federal narcotics statues and, as a result, I have been successful in arresting and convicting numerous individuals associated with narcotics distribution. I have been involved in the execution of numerous search warrants dealing with the detection and investigation of federal narcotics violations. I have participated in federal and state wiretap investigations and prosecutions. As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Northern District of Illinois and elsewhere to sell and distribute controlled substances. I have become familiar with codes, slang

2

terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Northern District of Illinois and elsewhere. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Northern District of Illinois, the Eastern District of Tennessee, the Southeastern United States, and Mexico. I am familiar with modern communication devices, their capabilities, and their potential uses in criminal and non-criminal contexts.

## BACKGROUND OF THE UNITED CARTELS AND MICHOACÁN

6.      Michoacán is a state in the west-central part of Mexico. It has more than 4.5 million residents and is roughly the size of West Virginia. Michoacán includes Pacific Ocean beaches and coastline, lake regions, river valleys, and rugged mountainous regions. Michoacán is bordered by the Mexican states of Jalisco, Guerrero, and Guanajuato, the Capital State, Queretaro, and Colima. It is the leading producer of avocados in Mexico and the leading exporter of avocados to the United States. It is also a violent state that is plagued by organized criminal groups, including the United Cartels, which control large portions of the state. The violence, extortion, and corruption wrought by the United Cartels and other organized criminal groups in Michoacán has caused many residents to flee the region, contributing to the illegal immigration crisis in the United States. Unfortunately, this situation is not a recent development in Michoacán.

7.      In the early 2010s, large swaths of Michoacán were controlled by the Knights Templar Cartel. Much like the later United Cartels, the Knights Templar trafficked drugs to the United States and terrorized the local population with extortion, kidnapping, and killings. In or around 2013, local groups of citizens, frustrated at the lack of government intervention and protection from Knights Templar activities, armed themselves and began to push back against the Knights Templar Cartel. These local groups of armed citizens were known as "autodefensas," or

3

self-defense groups. Ultimately, these self-defense groups successfully drove the Knights Templar Cartel out of power.

8.     After the success of the self-defense groups, the Mexican government sought to reassert its control of the region and began to regulate the self-defense groups. Over time, former members of the Knights Templar Cartel and other drug traffickers began to infiltrate the self-defense groups that were now ostensibly run by the government, and reasserted drug-financed cartel control over Michoacán once again. Drug trafficking leaders, including Juan Jose Farias Alvarez, also known as "El Abuelo" ("ABUELO"), Alfonso Fernandez Magallon, also known as "Poncho" ("PONCHO"), and Nicolas Sierra Santana, also known as "Gordo" ("GORDO"), rose to power by turning what had started as autodefensas back into drug trafficking cartels. These new drug trafficking organizations in Michoacán ultimately began to work together, which led to the creation of the United Cartels.

9.     The United Cartels is a drug trafficking organization that controls large swaths of territory in Michoacán, Mexico. The leader of the United Cartels is ABUELO. The United Cartels serves as an umbrella organization for several smaller cartels that work together to acquire, manufacture, and distribute illegal drugs such as methamphetamine, fentanyl, and cocaine. The United Cartels work together to export those illegal drugs from Michoacán to the United States. The profits from the sale of illegal drugs in the United States are used to acquire heavy weaponry, hire armed fighters, bribe local officials, and fund the lifestyles of the cartel leaders.

10.     One cartel under the United Cartels umbrella is the Cartel del Abuelo. This drug trafficking organization is headquartered in Tepalcatepec, Michoacán, and is led by ABUELO himself. ABUELO has worked with others to acquire cocaine from Colombia using planes and maritime shipping. ABUELO has been personally involved in the exportation of large quantities

4

of cocaine to the United States, including Chicago, Illinois. ABUELO also controls armed groups that enforce his edicts and ensure that methamphetamine and fentanyl producers in his territory pay him the required tax on drugs that are shipped from Michoacán to the United States.

11.    The Los Reyes Cartel is another cartel that currently operates under the United Cartels umbrella. The Los Reyes Cartel is led by PONCHO. Like ABUELO, PONCHO uses armed groups to enforce his orders, and ensure he is paid the required tax on drug produced and shipped to the United States from his territory. PONCHO himself was involved in the shipment of large quantities of methamphetamine from Michoacán to the United States, including shipments of methamphetamine to Colorado. PONCHO controls landing strips that are used by planes carrying cocaine from Colombia to Michoacán. The Los Reyes Cartel is headquartered in Los Reyes, Michoacán.

12.    The Los Viagras Cartel is a third cartel that until recently operated under the United Cartels umbrella. The Los Viagras Cartel is led by GORDO. GORDO and Los Viagras are notoriously violent, and are prolific methamphetamine producers, who then ship that methamphetamine to the United States, including shipments of large quantities of methamphetamine to Atlanta, Georgia. The Los Viagras Cartel has a heavy presence in Apatzingán, Michoacán, and Uruapan, Michoacán.

13.    ABUELO, PONCHO, and GORDO have been trafficking illegal drugs, including methamphetamine and cocaine, to the United States for decades. Carteles Unidos (also known as United Cartels, Tepalcatepec Cartel, Cartel de Tepalcatepec, The Grandfather Cartel, Cartel del Abuelo, Cartel de Los Reyes) were designated as a foreign terrorist organization by the Secretary of State on February 20, 2025.

   *Activities of the United Cartels*

5

14.     The United Cartels have become remarkably proficient at acquiring commercially available precursor chemicals, which are necessary for the production of methamphetamine and fentanyl. These chemicals are primarily sourced from China, but can also be acquired from other countries around the world. The United Cartels' commercial suppliers include companies that sell precursor chemicals to cartel affiliated chemical brokers, who then feed those chemicals into the production of methamphetamine and fentanyl in Michoacán. Some of these companies selling precursor chemical are complicit. Others may be unwitting. Cartel affiliated chemical brokers sell the entire recipe of needed chemicals for the production of methamphetamine and fentanyl directly to drug producers, selling the chemicals by the barrel. These chemicals, in the quantities sold, are capable of producing thousands of kilograms of synthetic drugs a month.

15.     Members of the United Cartels, and their associates, are involved in the large-scale production of methamphetamine and fentanyl in the Michoacán territory that they control. These methamphetamine mega labs are generally located outdoors, in rural locations, and can produce thousands of kilograms a month. The mega labs can have up to seven "reactors" or stills, all capable of creating massive quantities of methamphetamine at a single time. There are many different clandestine mega labs operating at any given moment in territory controlled by the United Cartels, making the United Cartels one of the most prolific methamphetamine producing organizations in the world.

16.     After methamphetamine production is complete, the methamphetamine is kept in powder or liquid form, concealed for shipment into the United States, and then sent to trusted associates in the United States for conversion into crystal form and further distribution. The United Cartels uses tractor trailer trucks with hidden compartments, commercial buses, buckets of liquid methamphetamine disguised as paint or other legal products, to smuggle the methamphetamine

6

into the United States. The United Cartels uses trusted associates in the United States, usually Mexican nationals living in the United States, to receive and distribute the methamphetamine once it arrives in the United States. After receiving the powder or liquid methamphetamine, those U.S.-based associates of the United Cartels use a conversion process to convert the powder or liquid methamphetamine into crystal methamphetamine, which is the form preferred by users in the United States. This conversion process is usually done in garages or empty homes rented by the United Cartels and their associates in the United States. These conversion "lab" locations are found in both metropolitan areas as well as rural areas. There is evidence that drug traffickers prefer conversion and distribution centers outside of major metropolitan areas to avoid heavy federal and state law enforcement presence, to avail themselves of lower rents, and to easily access the United States' interstate transportation network.

17.     Fentanyl is generally manufactured and/or pressed into pill form in smaller locations in Mexico, usually in cities or towns, and then packaged for shipment to the United States. Cocaine is acquired from Colombia and then forwarded into the United States using some of the same transportation channels used to ship methamphetamine and fentanyl into the United States.

18.     While illegal drugs exported by the United Cartels are distributed throughout the United States, major distribution hubs for the United Cartels include Dallas, Texas; Houston, Texas; Atlanta, Georgia; Kansas City, Missouri; Sacramento, California; Denver, Colorado; and Chicago, Illinois. The United Cartels also distribute illegal drugs to Europe, Australia, and elsewhere.

*Violence and Armed Groups*

19.     The United Cartels uses the profits from selling illegal drugs in the United States

7

to fund the acquisition of high-powered weaponry and the hiring of armed fighters and mercenaries. The United Cartels uses Improvised Explosive Devices, fully automatic weapons, drone warfare, foreign mercenaries, .50 caliber rifles, rocket-propelled grenades (RPGs), armor piercing munitions, and improvised tanks to assert control of their region. One of the primary threats faced by the United Cartels is an effort by the rival cartel, Cártel de Jalisco Nueva Generación ("CJNG"), to invade territory controlled by the United Cartels. Using the weapons acquired from the proceeds of drug sales, several armed groups are involved in asserting United Cartels control over their territory and defending their territory from CJNG attacks.

20.     One such group known as the "Kamonis" is led by Edgar Orozco Cabadas, who is also known as "El Kamoni" ("KAMONI"). KAMONI works closely with ABUELO and other United Cartels leaders to enforce cartel territorial control. KAMONI also invests in the production and distribution of methamphetamine exported to the United States, including to Atlanta, Georgia and Texas. Another armed group known as the R5s are led by Luis Enrique Barragan Chavez, also known as "Wicho" and "R5" ("WICHO"). WICHO works closely with the leader of the Los Reyes Cartel, PONCHO, serving as his second-in-command, and assists other United Cartels leaders to enforce cartel territorial control. WICHO also invests in methamphetamine production and distribution, including methamphetamine exported to Denver, Colorado.

## PROBABLE CAUSE

21.     This investigation began in a little town outside of Knoxville in December of 2019. Two methamphetamine distributors got into a motor vehicle accident near Rockwood, Tennessee. They fled the accident scene, dumping a pelican case filled with methamphetamine behind a nearby building. Law enforcement arrived on the scene, discovered the methamphetamine in the pelican case, and arrested the two methamphetamine distributors. A federal investigation began,

8

led by the United States Attorney's Office for the Eastern District of Tennessee, HSI, and the Tennessee Bureau of Investigation. Federal investigators utilized numerous federal search warrants, four rounds of federal wiretaps, surveillance, and other investigative methods, to learn that Eladio Mendoza ("MENDOZA") was leading a group of individuals distributing a massive amount of methamphetamine, fentanyl, and other drugs in the Southeastern United States. MENDOZA's distribution network ("MENDOZA NETWORK") was operating in and around Atlanta, Georgia.

22.     As a part of that investigation, on or about January 9, 2020, law enforcement conducted surveillance outside a hotel room located near Atlanta, Georgia. Law enforcement knew that the MENDOZA NETWORK was selling large quantities of methamphetamine and other drugs from that location. Law enforcement observed a vehicle with a Tennessee license plate park near the room. Cody Seals ("SEALS") was the driver. SEALS entered the hotel room and then left the room shortly thereafter. Law enforcement saw SEALS walk out of the room with a large Doritos bag. SEALS then drove back into Tennessee. Once SEALS crossed back into Tennessee, two Tennessee Highway Patrol ("THP") troopers, coordinating with the federal investigation, attempted to conduct a traffic stop on SEAL's vehicle, but SEALS did not pull over. Instead, he fled at a high rate of speed and fired a gun out of his vehicle at the pursuing THP Troopers. The pursuing THP Troopers pit maneuvered SEAL's vehicle and caused SEAL's vehicle to come to a stop. SEALS exited his vehicle firing a long gun, with a drum magazine, that resembled an AK-47. A picture of that weapon is below:

9



23.     SEALS advanced on one THP Trooper, attempting to kill that trooper, and wounded that trooper in the leg. A second THP trooper was able to shoot SEALS to end the firefight. A picture of one of the Troopers' vehicles, riddled with bullet holes, is below:



24.     Inside SEAL's vehicle, in a Doritos bag, law enforcement found over a kilogram of methamphetamine and a smaller amount of heroin.

25.     The investigation into the MENDOZA NETWORK continued, and on or about March 8, 2020, law enforcement observed a tractor-trailer truck (18-wheeler) located on a property suspected of being used by the MENDOZA NETWORK as a stash house ("STASH HOUSE"). After running the license plate on the tractor trailer truck, federal investigators learned that the tractor trailer truck had crossed the border from Mexico approximately four or five days earlier.

26.     The following day, on or about March 9, 2020, law enforcement executed a series of search warrants on three locations used by the MENDOZA NETWORK. Those locations included the STASH HOUSE, a location lived in by MENDOZA ("MENDOZA RESIDENCE"), and on another location used by the MENDOZA NETWORK that served as a methamphetamine conversion laboratory. All three locations were located in the Northern District of Georgia. At the first location, the STASH HOUSE, law enforcement discovered equipment for the conversion of powder and liquid methamphetamine into crystal methamphetamine, and two vehicles loaded with methamphetamine.

27.     Hidden in the floor of an otherwise empty tractor trailer, law enforcement discovered and seized approximately 850 kilograms of methamphetamine. In a bus, also parked on the property, law enforcement discovered and seized approximately 17 kilograms of methamphetamine hidden inside compartments on that bus. Pictures of the methamphetamine hidden the floor of the tractor trailer are below:

11



28.     Inside the MENDOZA RESIDENCE, law enforcement found and seized approximately 52 kilograms of methamphetamine that appeared to match the packaging of the approximately 17 kilograms of methamphetamine found inside the bus. Law enforcement also discovered and seized a large quantity (over 200 grams) of fentanyl pills. After additional searching, law enforcement also discovered approximately $180,000 in cash hidden in the house.

29.     At a third location, law enforcement found an active conversion lab with liquid methamphetamine being converted into crystal methamphetamine.  In total, law enforcement discovered approximately 37 kilograms of methamphetamine in this location, along with approximately 7 kilograms of heroin. In total, law enforcement seized more than 950 kilograms of methamphetamine from the MENDOZA NETWORK.

30.     During the seizures on or about March 9, 2020, law enforcement recovered approximately 15 telephones used by members of the MENDOZA NETWORK.  One such phone,

the TARGET DEVICE,[1] was seized from a co-conspirator named Jose Cruz Landeroz-Tovar ("LANDEROZ"), on or about March 9, 2020. Law enforcement tracked the location of LANDEROZ and the TARGET DEVICE, and observed LANDEROZ travel from the STASH HOUSE to the MENDOZA RESIDENCE, enter the MENDOZA RESIDENCE, and then leave. LANDEROZ's vehicle was stopped and law enforcement arrested him. Law enforcement found a firearm, a small amount (gram quantities) of methamphetamine, drug paraphernalia, and approximately $2,500 in cash inside LANDEROZ's vehicle. On LANDEROZ's person, and in the vehicle driven by LANDEROZ, law enforcement found several electronic devices, including the TARGET DEVICE.

31.     Law enforcement then obtained a search warrant, on or about April 13, 2020, from a federal magistrate judge in the Eastern District of Tennessee to search the TARGET DEVICE and other devices. As part of the court authorized search of the TARGET DEVICE, law enforcement extracted a large amount of data from the TARGET DEVICE.  That data and the TARGET DEVICE continue to be possessed by law enforcement in a secure federal law enforcement facility in the Eastern District of Tennessee.

32.     In the data extracted from the TARGET DEVICE, law enforcement observed numerous conversations related to the receipt and distribution of illegal drugs, and numerous conversations with individuals using Mexico based phone numbers.

33.     For example, the TARGET DEVICE contained WhatsApp messages with an individual who was using the phone number 52-443-109-7944, which is a Mexico based phone

---

[1] A wiretap on a phone number used by the TARGET DEVICE showed that previously, the TARGET DEVICE was used by MENDOZA. LANDEROZ was carrying the device on March 9, 2020, because MENDOZA had recently given him the device after the screen cracked.

number. That individual, hereinafter "CD1", was later charged with drug trafficking offenses in the Eastern District of Tennessee. CD1 later unwittingly traveled to the United States, was arrested, pled guilty, and cooperated with the United States in the hopes of reducing his sentence. CD1 told federal investigators that he shipped large quantities of methamphetamine to MENDOZA, including a shipment he sent in the days leading up the March 9, 2020, seizures at the STASH HOUSE and the MENDOZA RESIDENCE. The messages discovered between CD1 and MENDOZA, who was using the TARGET DEVICE, include the following portion of a conversation that took place on or about February 19, 2020:[2]

> CD1: Buddy, they are going, going to call you on my behalf. Hand them the little key so some people can stay around there and um, I'm here with my buddy talking, bud, we are also going to put in- in case the car gets delayed even more, we'll send a small truck with about sixty (60) so you can be ready, god willing.

> MENDOZA: Yeah, buddy. As matter of fact, there's, there's, a guy there so the house won't look deserted, I put one of my guys in there, he sleeps there, he goes there every day and spends the night there-he's going to be there and in his house, and I go every eight (8) days to eat there so it won't look so deserted. But yeah, the house is ready, buddy. And I'll hand over the keys to whomever you tell me too.

34.     Based on my training and experience, as well as the context of this conversation within the investigation, I believe that during this conversation, CD1 asked MENDOZA to make sure that a stash house was ready to receive a large shipment of methamphetamine ("Hand them

---

[2] This conversation was translated from Spanish into English by a fluent speaker of both languages.

the little key[s] so some people can stay around there") because CD1 was sending a truck or bus loaded with 60 or 600 kilograms of methamphetamine in a small truck in case the car they are also sending gets delayed ("in case the car gets delayed even more, we'll send a small truck with about sixty, so you can be ready"). MENDOZA responded that the house was ready ("there's a guy there so the house won't look deserted") and that he was ready to hand over the keys to the house to CD1's men whenever he was asked ("I'll hand over the keys to whomever you tell me too.").

35. On or about February 21, 2020, CD1 had the following conversation with MENDOZA, in part, as follows:[3]

> CD1: No, no, no, you be cautions; when you [see/feel] something bad, leave. Um, alright, we're at the line, as I told you, everything is good. I'm just waiting on them to let me know about the jumped but they told me we would jump this weekend, buddy, with the food, so you can be there. Anyways, I told my buddy, the one who gave you the pieces, so you could be doing something in the meanwhile. You know that job benefits you in either way, right?

36. Based on my training and experience, as well as the context within this investigation, I believe that during this conversation, CD1 told MENDOZA that he had a shipment of methamphetamine at the border ready to cross the border ("We're at the line, as I told you, everything is good."). CD1 told MENDOZA that he expected the methamphetamine to cross the border into the United States over the weekend and asked MENDOZA to be ready ("we would jump this weekend, buddy, with the food, so you can be there.")

37. On or about March 4, 2020, or approximately 5 days before a large amount of

---

[3] This conversation was translated from Spanish into English by a fluent speaker of both languages.

methamphetamine was seized at the STASH HOUSE run by MENDOZA, CD1 sent a message to MENDOZA indicating that a large amount of methamphetamine was headed his way in a truck:

> CD1: It's going to get good soon, um, the trailer is on that side of the river [Ria or Tia]. It's going to be a fucking good hit. My buddy was given the permits and everything already, that's why we wanted to send out this truck so you wouldn't be without doing something.[4]

38. Based on my training and experience, as well as the context within this investigation, I believe that during this conversation, CD1 told MENDOZA that he had a large amount of methamphetamine that just crossed into the United States ("It's going to get good soon, the trailer is on that side of the [Ria or Tia]."). CD1 indicated that it would be a large load ("It's going to be a fucking good hit").

39. CD1 later reviewed these conversations and confirmed that in these messages he was coordinating the arrival of a large shipment of methamphetamine, from Mexico, into the United States. CD1 stated that these conversations were with MENDOZA and that MENDOZA was supposed to receive the methamphetamine and return the cash proceeds from drug sales to CD1 and his associates as payment for the methamphetamine. CD1 told investigators that he lived in Michoacán, and he brokered the sale of large quantities of methamphetamine. CD1 admitted to investigators that he worked with others, including individuals federal investigators have identified as members or associates of the United Cartels, to produce and distribute methamphetamine.

40. Through federal search warrants, cooperating defendants, and confidential sources, law enforcement learned that MENDOZA fled the United States after law enforcement searched the STASH HOUSE and MENDOZA RESIDENCE on or about March 9, 2020. MENDOZA fled

_____

[4] This conversation was translated from Spanish into English by a fluent speaker of both languages.

to Michoacán, Mexico. There, based on the information available to the United States, MENDOZA was killed several weeks or months after he fled the United States by cartel leaders unhappy with the loss of methamphetamine, fentanyl, heroin, and cash during the March 9, 2020, seizures by law enforcement.

41. The TARGET DEVICE and the data extracted from it, are currently in the lawful possession of HSI. As noted above, federal law enforcement previously sought and received a federal search warrant to search the TARGET DEVICE on or about April 13, 2020. Therefore, while HSI might already have all necessary authority to examine the TARGET DEVICE and data extracted from the TARGET DEVICE, I seek this additional warrant out of an abundance of caution to be certain that an examination of the TARGET DEVICE and the data extracted from the TARGET DEVICE will comply with the Fourth Amendment and other applicable laws.

42. The TARGET DEVICE and the data previously extracted from it are currently in storage at a secure law enforcement facility located in the Eastern District of Tennessee. In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of law enforcement.

## **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

32. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities, to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

17

b.      Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices. This includes the laundering of drug proceeds, depositing of drug proceeds, managing accounts, and managing the family's expenses. In the modern day, these financial activities are frequently done using a phone.

c.      Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales. I am also aware that at least some of this type of information is frequently shared with spouses of drug traffickers, to facilitate travel, explain absences, coordinate wire transfers, coordinate the receipts of drug proceeds, and to coordinate family expenditures.

d.      Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.      I am aware the drug traffickers in Mexico commonly use WhatsApp to communicate because of its perceived protections from law enforcement surveillance. Drug

18

traffickers frequently send audio clip messages, photographs, videos, and text messages using WhatsApp. While WhatsApp messages are encrypted, they can be stored in a viewable format on a device that has sent or received the messages for an indefinite period. Audio of MENDOZA's voice would constitute admissible evidence.

        f.     I am aware that drug traffickers and others take photographs that document their families, their associates, their trade, their travels, their lifestyles, their homes, and their property. This evidence can be powerful evidence of involvement in a conspiracy, evidence of unexplained wealth, and/or evidence of travel to cartel related meetings.

        g.     Based on my training and experience, as well as the seizures of other devices from cartel members, associates, and their family members, I am aware that seized electronic devices from cartel members and associates can yield a wealth of evidence of their affiliation with cartels, their role in those organizations, their contacts, their associates, their methods of operations, their identities, their unexplained wealth, their operating areas, their communications, their movement of cash proceeds from drug sales, their knowledge about their activities, their motives for their activities, and their knowledge that the illegal narcotics, including methamphetamine, are destined for the United States.

## TECHNICAL TERMS

    33.    Based on my training and experience, I use the following technical terms to convey the following meanings:

        a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS")

consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through

21

cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.     Based on my training, experience, and research, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, a GPS device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICE because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

37.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device and data consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

38.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the property described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Robert Melone
Special Agent
HSI

Subscribed and sworn to before me
on July 10, 2025:

_____
JILL E. MCCOOK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

A Samsung Galaxy J2, Model: SM-J260T1; Phone #: 706-837-8451; IMEI: 356212108070237; hereinafter the "TARGET DEVICE," and the data previously extracted from the TARGET DEVICE pursuant to a federal search warrant. The TARGET DEVICE and the data extracted from the TARGET DEVICE are currently located at a secure law enforcement facility in the Eastern District of Tennessee.

This warrant authorizes the forensic examination of the TARGET DEVICE, and the data previously extracted from the TARGET DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) 21 U.S.C. §§ 959, 963 (conspiracy to import controlled substances into the United States), hereinafter the "Subject Offenses," and involve MENDOZA, CD1, KAMONI, and others since occurring on or after December 1, 2019, up until March 9, 2020, including information pertaining to the following matters:

    a.    Evidence relating to the subject offenses, including conversations, posts, photographs and other evidence concerning the distribution of controlled substances;

    b.    Communications and coordination efforts between MENDOZA, CD1, United Cartels members and associates, and others regarding the movement and storage of precursor chemicals and drugs and the movement, storage, and laundering of drug proceeds and other supporting criminal activities;

    c.    Evidence indicating state of mind as it relates to the violations under investigation;

    d.    The identity of the person(s) involved in the Subject Offenses, including records that help reveal the whereabouts of such person(s);

    e.    The identity of the person(s) who participated in the Subject Offenses

    f.    Evidence of user attribution showing who used or owned the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically-stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.